United States District Court
Southern District of Texas
**ENTERED**
December 03, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KINETICA PARTNERS, LLC,          §
                                 §
            Plaintiff,           §
                                 §
v.                               §
                                 §
UNITED STATES DEPARTMENT         §
OF THE INTERIOR,                 §
                                 §    CIVIL ACTION NO. H-19-3758
            Defendant,           §
                                 §
and                              §
                                 §
TENNESSEE GAS PIPELINE           §
COMPANY, L.L.C.,                 §
                                 §
      Intervenor-Defendant.      §

### MEMORANDUM OPINION AND ORDER

Plaintiff Kinetica Partners, Inc. ("Plaintiff") alleges that the June 27, 2019, Order ("Order") issued by the Assistant Secretary of Land and Mineral Management ("the ASLM") of the United States Department of the Interior ("DOI") violated the Administrative Procedure Act ("APA") and denied Plaintiff due process under the Fifth Amendment of the United States Constitution.[1] Tennessee Gas Pipeline Company, L.L.C. ("Tennessee Gas") intervened on DOI's behalf.[2]  Pending before the court are

---

[1]Complaint, Docket Entry No. 1, pp. 1-2 ¶¶ 1-3.  All page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

[2]Order Granting Motion to Intervene, Docket Entry No. 20.

Plaintiff's Motion for Summary Judgment ("Plaintiff's MSJ") (Docket Entry No. 30); Intervenor-Defendant Tennessee Gas Pipeline Company, L.L.C.'s Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Tennessee Gas's MSJ") (Docket Entry No. 33); and Defendant's Cross-Motion for Summary Judgment ("DOI's MSJ") (Docket Entry No. 34). For the reasons set forth below, Tennessee Gas's MSJ will be denied, DOI's MSJ will be denied, Plaintiff's MSJ will be granted in part and denied in part, and The Order will be vacated.

## I.  <u>Regulatory Scheme</u>

This lawsuit concerns rights-of-way ("ROW"s) that are associated with oil and gas pipelines on the Outer Continental Shelf ("OCS"). Congress has charged the Secretary of the DOI with administering leases and ROWs on the OCS. 43 U.S.C. § 1337. The DOI Secretary has charged the Bureau of Safety and Environmental Enforcement ("BSEE") with regulating oil and gas developments on the OCS. 30 C.F.R. § 250.101.

Exercising this delegated authority, BSEE has established regulations governing the granting, assignment, and expiration of pipeline ROWs. 30 C.F.R. §§ 250.1009-250.1019. BSEE is vested specifically with the statutory authority to issue and regulate "[r]ights-of-way through the submerged lands of the outer Continental Shelf . . . for pipeline purposes for the transportation of oil, natural gas, sulphur, or other

-2-

minerals . . . ." 43 U.S.C. § 1334(e); 43 U.S.C. § 1337(p) (Interior "may grant a lease, easement or right-of-way on the outer Continental Shelf."). A company may construct and operate a pipeline in the OCS only if it has a valid federal ROW issued by BSEE. See 30 C.F.R. § 250.1000.

Holders of ROWs are required to decommission pipelines "[u]pon relinquishment, forfeiture, or cancellation of a right-of-way grant." Id. § 250.1010(h). ROW grants "shall be deemed to have expired" if "the purpose of the grant ceases to exist or use of the associated pipeline is permanently discontinued for any reason." Id. § 250.1014. "All holders of a ROW are jointly and severally liable for meeting decommissioning obligations for facilities on their ROW, including pipelines, as the obligations accrue and until each obligation is met." 30 C.F.R. § 250.1701. These liabilities accrue as soon as a party "become[s] the holder of a pipeline right-of-way on which there is a pipeline, platform, or other facility." 30 C.F.R. § 250.1702. Once a facility, including a pipeline, is "no longer useful for operations," the holder must decommission that facility. 30 C.F.R. § 250.1703.

If pipelines on the OCS are used for "the transportation of natural gas in interstate commerce" or "foreign commerce," they may also be subject to regulation by the Federal Energy Regulatory Commission ("FERC"). 15 U.S.C. § 717(b). FERC is an independent regulatory commission within the Department of Energy, 42 U.S.C. § 7171(a), that is charged with issuing "certificate[s] of public

convenience and necessity, including abandonment of facilities or services, and the establishment of physical connections under section 7 of the Natural Gas Act," id. § 7172(a)(1)(D). Section 7(b) of the Natural Gas Act bars any natural gas company from "abandon[ing] all or any portion of its facilities subject to the jurisdiction of FERC, or any service rendered by means of such facilities, without the permission and approval of [FERC]." 15 U.S.C. § 717f(b).

## II.  Factual and Procedural History

In September of 2013 Plaintiff and Tennessee Gas closed an amended purchase and sale agreement pursuant to which Plaintiff acquired approximately 1,300 miles of Tennessee Gas's offshore pipeline system and was to acquire the appurtenant ROWs after the closing.[3]  The parties closed their agreement after FERC had approved the abandonment-by-sale of the pipelines from Tennessee Gas to Plaintiff.[4]  The parties then jointly sought approval from BSEE to assign the appurtenant ROWs to Plaintiff.[5]

On April 25, 2014, and May 2, 2014, BSEE rejected the proposed assignments for twelve ROWs (the "Assignment Rejection Orders") because it found that each of the twelve pipeline segments

---

[3]Tennessee Gas and BSEE's Joint Motion for Reconsideration ("Joint Motion for Reconsideration"), Docket Entry No. 28-1, AR0015, AR0021, p. 21.

[4]Id.

[5]Id. at AR0023.

associated with the ROWs had ceased transporting gas for at least 90 days.[6] According to BSEE, some of the subject pipeline segments had last transported gas more than fifteen years before the assignment requests.[7] BSEE therefore determined that each ROW associated with the twelve pipelines was "deemed expired" and could not be assigned.[8]

On July 9, 17, and 23, and August 13, 2014, BSEE issued additional notices ("Expiration Notices") to Tennessee Gas, confirming that the ROWs had expired because Tennessee Gas had not submitted an application to BSEE to maintain each ROW within 90 days of when the pipelines associated with each ROW ceased to transport product.[9] Therefore, each "ROW grant . . . [was] deemed to have expired . . . due to the pipeline not being used for the purpose for which the pipeline ROW grant was issued."[10]

Tennessee Gas petitioned BSEE to administratively reestablish the ROWs on August 7, 2014, and again on June 1, 2015.[11]   BSEE

---

[6]Assignment Rejection Orders, Docket Entry Nos. 28-2, 28-3, and 28-4, AR0311-372.

[7]E.g., Docket Entry No. 28-3, AR0342 ¶ 6 ("the pipeline ceased flowing hydro-carbons 06/02/1998"), p. 11.

[8]Assignment Rejection Orders, Docket Entry Nos. 28-2, 28-3, and 28-4, AR0311-372.

[9]Expiration Notices, Docket Entry No. 28-1, AR0299-310.

[10]Id.

[11]Letter from Acting Regional Supervisor of BSEE Gulf of Mexico OCS Region to Tennessee Gas ("BSEE's Letter to TGP"), Docket Entry No. 29-2, AR0449-50, pp. 77-78.

deemed both petitions deficient because neither petition set forth the primary purpose for which the ROWs would be used as required by 30 C.F.R. Sec. 250.1015(a).[12]  BSEE stated that

> [g]iven the lack of any future utility for the pipelines at issue, the purpose of the grant has ceased to exist pursuant to 30 CFR 250.1014.  The ROWs have, therefore, expired as BSEE had earlier determined.[13]

In a July 21, 2015, letter Plaintiff confirmed with BSEE that the ROWs had no future utility for Plaintiff and that "all of the lines" associated with the ROWs "had no-flow on them for some time, ranging between June 1998 to September 2013."[14] Accordingly, BSEE issued an order on October 22, 2015 ("Final Order"), confirming that the ROWs had expired and refusing to administratively reestablish the ROWs.[15]

In July of 2016 Tennessee Gas appealed BSEE's 2015 Final Order and Expiration Notices to the Interior Board of Land Appeals ("IBLA"), an agency tribunal that considers appeals from the public lands agencies within the Interior Department.[16]  See 43 C.F.R.

---

[12]Id. at AR0450, p. 78.

[13]Id.

[14]Letter from Kinetica Partners, LLC to BSEE Gulf of Mexico OCS Region ("Plaintiff's Letter to BSEE"), Docket Entry No. 29-2, AR0452-53, pp. 80-81.

[15]BSEE's Letter to TGP, Docket Entry No. 29-2, AR0449-450, pp. 77-78.

[16]Statement of Reasons of Tennessee Gas Pipeline Company, LLC ("Statement of Reasons"), Docket Entry No. 29-2, AR0414-448, pp. 42-76.

§ 4.1.  BSEE defended its decision that the ROWs had expired, stating that

> two basic facts cannot be ignored:  The pipelines have sat idle for years and neither TGP nor Kinetica can provide a primary purpose or a statement of any future utility for the ROWs.  These circumstances, regardless of their genesis, demonstrate that the ROWs are properly deemed expired and have no basis for re-establishment.[17]

On September 11, 2017, the IBLA affirmed the Expiration Notices and 2015 Final Order, holding that

> the record supports BSEE finding that these pipeline ROW grants were of no use . . . and that their purpose had therefore ceased to [exist], which permitted BSEE to deem these OCS pipeline ROW grants to have expired under 43 C.F.R. § 250.1014.[18]

The IBLA relied in part on the 2013 order in which FERC approved the abandonment-by-sale of the pipelines from Tennessee Gas to Plaintiff:

> FERC re-examined all certificated pipelines, found most performed a transportation function under its jurisdiction, approved their abandonment by TGP, and granted a certificate of public convenience and necessity to Kinetica Energy.  However, FERC separately addressed unused or underutilized pipelines, which included the 12 DOT pipelines at issue in this appeal.[19]

On August 4, 2017, Tennessee Gas met with BSEE's solicitor to urge that the agency seek a voluntary remand.[20]  Tennessee Gas also

---

[17]BSEE's Answer to Defendant's Statement of Reasons in IBLA Appeal, Docket Entry No. 29-2, AR0396, AR0411-12, pp. 39-40.

[18]Opinion of Administrative Judge Jackson affirming Final Order ("IBLA Affirmation"), Docket Entry No. 28-1, AR0280, p. 280.

[19]Id. at AR0281-82, pp. 281-282.

[20]E-Mail from Tennessee Gas's Counsel to BSEE Solicitor, Docket Entry No. 29-2, AR0686, p. 314.

sent BSEE a white paper explaining its arguments for remand.[21] Tennessee Gas argued that despite what Plaintiff had told BSEE in 2015, Plaintiff had told FERC in 2012 that it did "plan[] to put [the subject pipelines] to use in the future."[22]

In March of 2018 Tennessee Gas and BSEE jointly moved for reconsideration of the IBLA's September 2017 decision.[23]   They argued that the 2013 FERC order, "when parsed out in detail actually [held] that of the twelve pipelines at issue, FERC deemed only two of the pipelines to be inactive."[24]   They further argued that Plaintiff's representations to BSEE stating that it had no use for the twelve pipelines "not only conflicted with FERC's determination that only two of the twelve pipelines were 'inactive;' they directly contravened representations and statements that Kinetica made under oath to FERC."[25]   The Joint Motion for Reconsideration concluded:

> Because BSEE and the Board were unaware of material facts contained within the FERC docket — facts that would have demonstrated a purpose for the ROWs consistent with 30 C.F.R.   §   250.1014   —   the   Board   should   grant

---

[21]Id.

[22]Tennessee Gas's Reply in Support of Statement of Reasons, Docket Entry No. 29-2, AR0689, ARO690, pp. 317-318.

[23]Joint Motion for Reconsideration, Docket Entry No. 28-1, AR0015, p. 15.

[24]Id. at 27.

[25]Joint Motion for Reconsideration, Docket Entry No. 28-1, AR0015, AR0024-25, pp. 24-25.

> reconsideration, vacate its Decision, and remand to BSEE
> to reconsider expiration determinations, which could also
> re-open BSEE's decision on assignment applications.  Such
> a result will allow BSEE to issue a new decision that
> harmonizes the decisions of both agencies.[26]

In an order dated October 29, 2018, the IBLA granted the joint

petition of Tennessee Gas and BSEE for reconsideration, set aside

the appealed Final Order and Expiration Notices, and remanded the

matter to BSEE so it could decide whether to approve Tennessee

Gas's assignment of the ROWs to Plaintiff.[27]

One month after the IBLA's remand order, Tennessee Gas's

parent company, Kinder Morgan, wrote to the Senior Adviser to

BSEE's Gulf of Mexico Region Director requesting that the agency

"immediately approve all ROW assignment requests."[28]  Kinder Morgan

copied the ASLM and the BSEE Director on its letter, but did not

copy Plaintiff.[29]  In the same letter, Kinder Morgan indicated that

it was "reaching out to Assistant Secretary Balash and BSEE

Director Angelle to request a joint meeting."[30]

In a June 21, 2019, memorandum the Senior Counselor to the

ASLM noted that although "the IBLA [had] vacated its decision

---

[26]Id. at 30.

[27]Decision of Administrative Judge Jackson, Docket Entry
No. 28-1, AR0010, p. 10.

[28]Kinder Morgan's Revived Requests for Transfer of Rights of
Way ("Revived Request"), Docket Entry No. 28-1, AR0006, p. 6.

[29]Id. at AR0008, p. 8.

[30]Id.

upholding BSEE's decisions that the 12 ROWs at issue had expired," the fact remained that "[n]either TGP nor Kinetica appealed BSEE's original decision disapproving assignment of the ROWs to Kinetica; thus they were not vacated by the IBLA."[31] Nevertheless, the Senior Counselor wrote that "if ASLM reconsiders BSEE's disapproval of the assignments, there would be no need to revisit the other issues."[32] The Senior Counselor reasoned that no regulation, law, or policy directed BSEE to inquire into whether the ROWs should have been "deemed expired" before approving the assignments, and thus BSEE's investigation into the issue had been improper.[33] "It would be more reasonable," the Counselor wrote, "for assignment of the pipeline ROWs to be made to [Plaintiff] first and thereafter for BSEE to make a determination regarding whether the ROWs expired pursuant to the regulations."[34]

On June 27, 2019, the ASLM issued the Order, rescinding BSEE's Assignment Rejection Orders and approving the assignments from Tennessee Gas to Plaintiff.[35]  On September 30, 2019, Plaintiff filed a Complaint alleging that the Order was "unlawful, arbitrary and capricious, an abuse of discretion, and denied [Plaintiff] its

---

[31]Memorandum from Senior Counselor to the ASLM ("Senior Counselor's Memo"), Docket Entry No. 28-1, AR0003, p. 3.

[32]Id.

[33]Id. at AR004, p. 4.

[34]Id.

[35]Order, Docket Entry No. 28-1, AR0001-02, pp. 1-2.

right to due process under the Fifth Amendment to the U.S. Constitution."[36]  Plaintiff filed a motion for summary judgment on April 24, 2020.[37]  Tennessee Gas, intervening on DOI's behalf, filed a cross-motion for summary judgment on June 8, 2020.[38]  DOI also filed a cross-motion for summary judgment on June 8, 2020.[39]

### III.  <u>Standard of Review</u>

Summary judgment is appropriate if the movant establishes that there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.,</u> 106 S. Ct. 2505, 2511 (1986).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp. v. Catrett,</u> 106 S. Ct. 2548, 2552 (1986).

---

[36]Complaint, Docket Entry No. 1, p. 2 ¶ 3.

[37]Plaintiff's MSJ, Docket Entry No. 30.

[38]Tennessee Gas's MSJ, Docket Entry No. 33.

[39]DOI's MSJ, Docket Entry No. 34.

In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2110 (2000).

## IV.  Standing

Plaintiff alleges multiple substantive injuries as well as a procedural injury.  The substantive injuries consist of administrative costs and decommissioning liabilities for the subject ROWs and their attendant pipelines.[40]  The procedural injury consists of Plaintiff's exclusion from the ASLM's decision-making.[41]  DOI argues that Plaintiff lacks Article III standing because (1) Plaintiff has failed to demonstrate injury-in-fact, and (2) any injury Plaintiff might have sustained is self-inflicted and therefore not traceable to the Order.[42]

Under Article III of the Constitution, federal courts can only resolve "'cases'" and "'controversies.'"  Wilson v. Houston Community College System, 955 F.3d 490, 495 (5th Cir. 2020).  This requirement is satisfied if a plaintiff has standing.  Sprint

---

[40]Plaintiff's Reply in Support of Motion for Summary Judgment and Opposition to Cross-Motions for Summary Judgment ("Plaintiff's Reply"), Docket Entry No. 36, p. 12.

[41]Id. at 11.

[42]Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment ("DOI's Brief"), Attachment 1 to DOI's MSJ, Docket Entry No. 34-1, p. 10.

Communications Co., L.P. v. APCC Services, Inc., 128 S. Ct. 2531, 2535 (2008).  To establish standing, a plaintiff must show (1) an injury in fact (2) that is traceable to the defendant's conduct and (3) that can be redressed by the court.  Lujan v. Defenders of Wildlife, 112 S. Ct. 2130, 2136 (1992).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  Texas v. Rettig, 968 F.3d 402, 411 (5th Cir. 2020) (citing Lujan, 112 S. Ct. at 2136).

At the summary-judgment stage, plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts'" to establish their standing.  Lujan, 112 S. Ct. at 2137 (1992) (quoting Fed. R. Civ. P. 56(e)).  When evaluating plaintiffs' standing, courts must "take as true" the factual evidence plaintiffs submit.  McCardell v. Department of Housing and Urban Development, 794 F.3d 510, 520 (5th Cir. 2015).

When a plaintiff challenges a government action, "'the nature and extent of facts that must be averred . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action.'"  Three Expo Events, L.L.C. v. City of Dallas, Texas, 907 F.3d 333, 341 (5th Cir. 2018) (quoting Lujan, 112 S. Ct. at 2137).  This is "a basic question that underlies all three elements of standing."  Contender Farms, L.L.P. v. U.S. Dept. of Agriculture, 779 F.3d 258, 264 (5th Cir. 2015).  If the plaintiff is the object of the action (or forgone action) at issue, "there is ordinarily little question that the action or

inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." <u>Duarte ex rel. Duarte v. City of Lewisville, Texas,</u> 759 F.3d 514, 518 (5th Cir. 2014) (internal quotations and citations omitted).

**A.   Plaintiff's Substantive Injuries-in-Fact**

Plaintiff alleges two substantive injuries: (1) administrative costs for the ROWs and their attendant pipelines and (2) decommissioning liabilities for the pipelines.   Each of these two categories is further divided into actual injuries (for the administrative and decommissioning costs already paid) and threatened future injuries (for the administrative and decommissioning costs that Plaintiff says it will incur absent relief from this court).

"An injury in fact is 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" <u>Wilson,</u> 955 F.3d at 495 (quoting <u>Lujan,</u> 112 S. Ct. at 2136).   The injury-in-fact requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" <u>Susan B. Anthony List v. Driehaus,</u> 134 S. Ct. 2334, 2341 (2014) (quoting <u>Warth v. Seldin,</u> 95 S. Ct. 2197, 2205 (1975)).

**1.   <u>"Actual" Injuries</u>**

Plaintiff claims that as a result of the challenged Order from the ASLM, it "must now maintain [the ROW grants and associated

pipelines] and pay the substantial costs associated therewith, including annual payments to Interior required by law, 30 C.F.R. § 250.1012."[43]  Plaintiff also claims to have already "decommissioned seven of the twelve ROWs and appurtenant pipelines assigned to [it]," and that "[t]he cost of decommissioning those seven ROWs and pipelines is almost $2 million."[44]  DOI argues that Plaintiff has failed to show an injury-in-fact and thus cannot establish standing.[45]

"Monetary harm is a classic form of injury-in-fact. . . . Indeed, it is often assumed without discussion."  Danvers Motor Co., Inc. v. Ford Motor Co., 432 F.3d 286, 293 (3d Cir. 2005) (citing Adams v. Watson, 10 F.3d 915, 921 (1st Cir. 1993)).  The Fifth Circuit has consistently recognized monetary harm as a proper basis for showing injury-in-fact.  See, e.g., Rettig, 968 F.3d at 411 (5th Cir. 2020) (states' having to pay "millions of dollars in Provider Fees" constituted injury-in-fact); Legacy Community Health Services, Inc. v. Smith, 881 F.3d 358, 367 (5th Cir. 2018) ("[Plaintiff] has suffered a direct pecuniary injury that generally is sufficient to establish injury-in-fact.") (internal quotations and citation omitted); Norris v. Causey, 869 F.3d 360, 366 (5th

---

[43]Plaintiff's Reply, Docket Entry No. 36, p. 12 ¶ (ii).

[44]Declaration of Kurt Cheramie ("Cheramie Declaration"), Attachment 1 to Plaintiff's Reply, Docket Entry 36-1, p. 2 ¶ 5.

[45]Reply in Support of Defendant's Cross-Motion for Summary Judgment ("DOI's Reply"), Docket Entry No. 38, p. 12.

Cir. 2017) ("The [plaintiffs'] injury is clear: they lost thousands of dollars.").

Plaintiff's injury is clear: It has paid nearly $2 million in decommissioning liabilities[46] and incurred "substantial costs" for assets that the challenged Order assigned to it.[47]  See Norris, 869 F.3d at 366 (5th Cir. 2017).  These direct pecuniary injuries suffice to establish injury-in-fact.  See Legacy Community Health Services, Inc., 881 F.3d at 367.

2.  "Imminent" Injuries

Plaintiff also alleges that the Order subjects it to the threat of future pecuniary injuries.  Plaintiff claims that administrative costs "will continue to accrue until the remaining pipelines are decommissioned,"[48] and that absent relief from the court, it "expects" to pay $7 million to $8 million in additional decommissioning liabilities in 2020, 2021, and 2022.[49]  To show that these threatened future costs constitute injuries sufficient to confer standing, Plaintiff must show that they (1) will be potentially borne by Plaintiff, not someone else; (2) are concrete and particularized, not abstract; and (3) are actual and imminent, not conjectural or hypothetical.  Stringer v. Whitley, 942 F.3d

---

[46]Cheramie Declaration, Attachment 1 to Plaintiff's Reply, Docket Entry No. 36-1, p. 2 ¶ 5.

[47]Plaintiff's Reply, Docket Entry No. 36, p. 12.

[48]Plaintiff's Reply, Docket Entry No. 36, p. 12.

[49]Cheramie Declaration, Attachment 1 to Plaintiff's Reply, Docket Entry 36-1, p. 2 ¶¶ 7 and 8.

-16-

715, 720-21 (5th Cir. 2019) (quoting <u>Susan B. Anthony List</u>, 134 S. Ct. at 2341).

With respect to the administrative costs, Plaintiff meets its burden by citing 30 C.F.R. § 250.1012, which obligates pipeline-ROW holders to pay the Office of Natural Resources Revenue annual rent. The amount of rent is based on such factors as the statute miles of the OCS that the pipeline ROW crosses, the depth at which any accessories to the pipeline are located, and the acreage footprint of accessory sites. <u>Id.</u> The holder may make rental payments "on an annual basis, for a 5-year period, or for multiples of 5 years," with the first payment due when the ROW holder submits its pipeline ROW application, and all subsequent payments due "before the respective time periods begin." 30 C.F.R. § 250.1012(d).

The challenged ASLM Order assigned the subject ROWs to Plaintiff retroactively to September 1, 2013.[50] The Order is over a year old.[51] These facts, taken together with the requirements set forth in 30 C.F.R. § 250.1012, constitute sufficient "other evidence" that Plaintiff has incurred legal rent obligations for the subject ROWs and their attendant pipelines. Thus, the court rejects DOI's argument that Plaintiff has provided "no affidavit or other evidence, as required by <u>Lujan</u>, to establish these injuries."[52]

---

[50]Order, Docket Entry No. 28-1, AR0001, p. 1.

[51]<u>Id.</u>

[52]DOI's Reply, Docket Entry No. 38, p. 12 n.2.

The text of 30 C.F.R. § 250.1012 obligates Plaintiff to pay these costs, and it sets forth in specific terms the amount that Plaintiff will owe and the time at which Plaintiff must pay. Accordingly, Plaintiff's administrative costs (1) will be borne by Plaintiff, not someone else; (2) are concrete and particularized, not abstract; and (3) are imminent, not hypothetical. See Whitley, 942 F.3d at 720-21.

As for the decommissioning liabilities, Plaintiff sets forth by affidavit that it and it alone will bear them.[53]  The same affidavit sets forth a reasonably specific dollar-value for its injury:  approximately $7 million to $8 million.[54]  Thus, the sole issue with Plaintiff's threatened future decommissioning liability is the question of imminence.

"'[I]mminence' is concededly a somewhat elastic concept." Lujan, 112 S. Ct. at 2138 n.2.  DOI argues that the United States Supreme Court has held that "threatened injury must be certainly impending to constitute injury in fact,"[55] citing Clapper v. Amnesty International USA, 133 S. Ct. 1138, 1147 (2013).  But the Court in Clapper also noted that its cases "do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about.  In some instances, we have

---

[53]Cheramie Declaration, Attachment 1 to Plaintiff's Reply, Docket Entry 36-1, p. 2 ¶ 7.

[54]Id

[55]DOI's Reply, Docket Entry No. 38, p. 13.

-18-

found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." Id. at 1150 n.5 (internal citations omitted).

Numerous Supreme Court decisions describe the imminence requirement using various phrases that suggest "imminence" means something less than absolute certainty. See, e.g., Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2747 (2010) (finding standing where respondents demonstrated "reasonable probability" and "substantial risk" of injury); Davis v. Federal Election Commission, 128 S. Ct. 2759, 2769 (2008) ("realistic and impending threat of direct injury"); Clinton v. City of New York, 118 S. Ct. 2091, 2093 (1998) ("sufficient likelihood of economic injury"); Babbitt v. United Farm Workers National Union, 99 S. Ct. 2301, 2308 (1979) (plaintiff "must demonstrate a realistic danger of sustaining a direct injury").

Moreover, the Court acknowledged in a later case that "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending' or there is a 'substantial risk' that the harm will occur." Susan B. Anthony List, 134 S. Ct. at 2341 (internal citations omitted). The Fifth Circuit requires that "[f]or a threatened future injury to satisfy the imminence requirement, there must be at least a 'substantial risk' that the injury will occur." Whitley, 942 F.3d at 721 (internal citations omitted).

To meet the burden of showing imminence Plaintiff asserts that it "understands" the BSEE regulations at 30 C.F.R. § 250.1010(h) as "obligating [it] to decommission the inactive ROWs and pipelines associated therewith."[56]   Plaintiff further states that it "has not received any guidance from BSEE to the contrary."[57]

As explained in Part I above, BSEE's regulations concerning pipeline ROWs provide that if the purpose of a ROW grant ceases to exist, i.e. the grant expires, the holder of the grant will be responsible for decommissioning the ROW and its pipelines. However, mere "[t]emporary cessation or suspension of pipeline operations shall not cause the grant to expire."   30 C.F.R. § 250.1014.   The issue is whether Plaintiff has pled sufficient facts to show that it faces a substantial risk of paying decommissioning liabilities for the subject ROWs.

Plaintiff points to representations it made to BSEE in 2015 that it had no future utility for the pipelines.[58]   Nothing in the record reflects that Plaintiff has discovered some utility for the pipelines since then.   Nor does the record suggest that Plaintiff has used the ROWs since they were assigned to Plaintiff approximately seventeen months ago.

---

[56]Cheramie Declaration, Attachment 1 to Plaintiff's Reply, Docket Entry No. 36-1, p. 2 ¶ 4.

[57]<u>Id.</u>

[58]Plaintiff's Reply, Docket Entry No. 36, p. 9 n.2.

DOI argues that the future decommissioning liabilities are not an imminent injury because Plaintiff's pleadings leave open the possibility that it could "change its mind and decline to relinquish or forfeit the ROW grants," in which case "its injury would go away."[59]  DOI argues that Plaintiff "falls short of the requirements set forth by the Supreme Court" in Lujan because the affidavit in which Plaintiff describes the decommissioning liabilities "does not identify any agency order requiring decommissioning," and because Plaintiff "has provided no evidence that the ROW grant has been canceled by DOI."[60]  DOI characterizes as "conspicuous" Plaintiff's failure to not explicitly plead that it presently lacks future utility for the pipelines associated with the ROW grants.[61]

But under 30 C.F.R. § 250.1702, a party accrues liability as soon as it "become[s] the holder of a pipeline right-of-way on which there is a pipeline, platform, or other facility."  This, coupled with Plaintiff's past representations that it lacked a use for the pipelines, indicates that there is a "substantial risk" that Plaintiff will be forced to pay the decommissioning liabilities that it claims to expect.  Plaintiff has set forth by affidavit that it expects to incur costs in a specific amount

---

[59]DOI's Reply, Docket Entry No. 38, p. 13.

[60]Id.

[61]Id. at 14.

within a relatively specific time frame.   Since DOI submits no contrary evidence, the court must "take as true" the Plaintiff's factual evidence.   See McCardell, 794 F.3d at 520.   Plaintiff's evidence weighs strongly in favor of a finding that Plaintiff faces a substantial risk.

Moreover, Plaintiff is challenging a governmental action of which Plaintiff is itself the object.   While Lujan required plaintiffs to "'set forth' by affidavit or other evidence 'specific facts'" to establish standing, it also stated that where, as here, the plaintiff is the object of the government action (or forgone action) at issue, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."   Lujan, 112 S. Ct. at 2137.   The reason standing was "particularly difficult to show" in Lujan was because "third parties, rather than respondents, [were] the object of the Government action or inaction to which respondents object[ed]."   Id. at 2134.   That is not the case here.

The Order put Plaintiff at a greatly increased risk of bearing future decommissioning liability for the subject ROWs and their attendant pipelines.   Even if it is not "certainly impending," the risk of facing multimillion-dollar decommissioning liabilities is sufficiently "substantial" to "ensure that [Plaintiff] has a 'personal stake' in the outcome of the controversy."   See Susan B. Anthony List, 134 S. Ct. at 2341 (internal citations omitted).

-22-

The court concludes that Plaintiff's alleged pecuniary injuries in the form of administrative costs and decommissioning liabilities satisfy the injury-in-fact requirement.

## B.   Traceability of Plaintiff's Substantive Injuries

To satisfy the Article III standing requirement Plaintiff must show that the fact of its being burdened with administrative and decommissioning costs is "fairly traceable" to the challenged Order from the ASLM.  See Lujan, 112 S. Ct. at 2136.  Traceability (or "causation") requires that the injury "resulted," in some "concretely demonstrable way" from the challenged practice — that the injury is "the consequence of the defendants' actions, or that prospective relief will remove the harm."  Seldin, 95 S. Ct. at 2208.

Plaintiff easily meets this burden.  But for the challenged ASLM Order, the cost of maintaining the subject ROWs would have remained with Tennessee Gas. As soon as the ASLM assigned the ROWs to Plaintiff, 30 C.F.R. § 250.1012 made Plaintiff responsible for paying the associated rental costs.  Similarly, the decommissioning liabilities arise from regulations that obligate "pipeline ROW holders" like Plaintiff to decommission facilities on the subject ROWs. 30 C.F.R. § 250.1010(h).  But for the ASLM's Order Plaintiff would not be the holder of the pipeline ROWs.

"But-for" causation will not suffice if a plaintiff's injury is self-inflicted, because such an injury is not "fairly traceable"

to the challenged action.  <u>See, e.g., Clapper,</u> 133 S. Ct. at 1152 ("[R]espondents' self-inflicted injuries are not fairly traceable to the Government's purported activities."); <u>Zimmerman v. City of Austin, Texas,</u> 881 F.3d 378, 389 (5th Cir. 2018) ("[S]tanding cannot be conferred by a self-inflicted injury."), <u>cert. denied,</u> 139 S. Ct. 639 (2018); <u>Brotherhood of Locomotive Engineers and Trainmen, a Division of the Rail Conference-International Brotherhood of Teamsters v. Surface Transportation Board,</u> 457 F.3d 24, 28 (D.C. Cir. 2006) ("This injury was not in any meaningful way 'caused' by the Board; rather, it was entirely self-inflicted and therefore insufficient to confer standing upon the Union.").

"An injury is 'self-inflicted' so as to defeat standing only if 'the injury is so completely due to the plaintiff's own fault as to break the causal chain.'" <u>Backer ex rel. Freedman v. Shah,</u> 788 F.3d 341, 344 (2d Cir. 2015) (quoting 13 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3531.5, at 457 (2d ed. 1984)).  "Standing doctrine thus does not require a plaintiff to show that it made no choice that put it at risk of injury." <u>Ciox Health, LLC v. Azar,</u> 435 F. Supp. 3d 30, 51 (D.D.C. 2020).

The opinion in <u>Central Arizona Water Conservation District ("CAWCD") v. United States Environmental Protection Agency,</u> 990 F. 2d 1531 (9th Cir. 1993) is illustrative.  A water conservation district challenged an EPA Final Rule requiring a reduction in

sulfur dioxide emissions.  Id. at 1533.  The district's injury was economic:  The district was contractually required to repay a water management agency's share of costs of installing and maintaining the emission controls required by the Final Rule.  Id. at 1534. The EPA argued that since the District's alleged economic injury flowed from its obligations under its contract with the water management agency, the injury was not fairly traceable to the challenged Final Rule.  Id. at 1538.  The Ninth Circuit disagreed, holding that "[w]hile [the district's] contractual obligations may provide the basis for its economic liability for the increased costs imposed by the Final Rule, that hardly means that the Final Rule itself is not the direct cause of that liability."  Id.

### 1.   Plaintiff's Injuries in General

DOI argues that Plaintiff caused its own injuries.[62]  Some of the arguments apply only to specific injuries, but broadly speaking, DOI asserts that Plaintiff could have avoided being injured altogether if Plaintiff had not:  (1) agreed to the 2012 transaction to acquire subject ROWs from Defendant, (2) executed the assignment agreements and thereby accepted decommissioning and royalty obligations, and (3) submitted the assignment agreements to BSEE for approval.[63]  DOI argues that if Plaintiff had "declined to

---

[62]DOI's Reply, Docket Entry No. 38, p. 11.

[63]Id.

voluntarily take any one of those actions, it would not have been injured."[64]

The court is not persuaded by DOI's arguments. Plaintiff's decision to enter the subject transaction in 2012 may have "put [Plaintiff] at risk of injury," but that fact alone does not defeat standing. See Ciox Health, 435 F. Supp. 3d at 51. From Plaintiff's perspective, any risk that Plaintiff might have taken by entering the transaction disappeared in 2014, when BSEE rejected Plaintiff and Tennessee Gas's joint request to transfer the subject ROWs.[65] This rejection took the form of a series of lawful agency orders that were not timely appealed, on whose finality Plaintiff reasonably relied. Cf. Ritter v. Smith, 811 F.2d 1398, 1401-02 (11th Cir. 1987) ("The need for certainty with respect to land titles warrants a great deference to the need for finality of judgments.").

DOI argues that BSEE's decisions to reject the subject ROW assignments "were only final in the sense that the time to administratively appeal them had expired; they in no way prevented the natural consequences of [Plaintiff's] voluntary actions from continuing."[66]   DOI articulates no limiting principle for this

---

[64]Id.

[65]See Assignment Rejection Orders, Docket Entry Nos. 28-2, 28-3, and 28-4, AR0311-372.

[66]DOI's Reply, Docket Entry No. 38, p. 12.

argument — if, instead of five years, twenty years had passed between BSEE rejecting the assignments and the Order restoring them, then presumably DOI would still insist that Plaintiff must accept the ROWs, as if the parties' settled expectations were of no consequence.  The court does not accept this reasoning.

When BSEE rejected the ROW assignments in 2014 it broke the "causal chain" leading from Plaintiff's transaction with Tennessee Gas to Plaintiff's future injury.  See Shah, 788 F.3d at 344.  It was DOI, at the ex parte urging of Tennessee Gas's parent company, Kinder Morgan, that re-forged that chain when it revived a long-dead transaction without consulting Plaintiff or giving Plaintiff an opportunity to be heard.  While Plaintiff's transaction with Tennessee Gas may provide the basis for its economic liability for the administrative costs imposed by the challenged Order, the Order itself is still the direct cause of that liability.  See CAWCD, 990 F.2d at 1538.

For the same reasons, the court rejects DOI's argument that Plaintiff caused its own injury by "[telling] FERC that it had future utility for subject pipelines before telling DOI the opposite."[67]  DOI argues that "[t]hrough making shifting represen-tations to two different federal agencies with complementary authority over offshore pipelines, [Plaintiff's] voluntary actions caused an interagency conflict, which Interior understandably took

---

[67]Id. at 11.

remedial action to avoid."[68]   But nothing in the record indicates that Plaintiff was untruthful in its representation that it lacked utility for the pipelines.   As Plaintiff points out, it made its representation to FERC in 2013 and its representation to BSEE in 2015 — and in between, BSEE rejected the assignment of the pipelines to Plaintiff.[69]   Plaintiff "could not plausibly claim future utility for ROW grants that it did not own or possess."[70]

Accordingly, the court is not persuaded by DOI's argument that Plaintiff's administrative costs are "self-inflicted" injuries. The court concludes that these costs are injuries-in-fact and are fairly traceable to the challenged ASLM Order.

2.   <u>Decommissioning Liabilities</u>

DOI makes an additional traceability argument aimed specifically at the decommissioning liabilities:   "[Plaintiff's] decision to incur decommissioning costs for 7 pipelines was neither required by any DOI order nor necessary to avoid a certainly impending harm.   Accordingly, these self-inflicted costs are legally insufficient to create standing."[71]   To support this argument, DOI cites <u>Clapper,</u> in which the Court held that plaintiffs "cannot manufacture standing merely by inflicting harm

---

[68]<u>Id.</u> at 12.

[69]Plaintiff's Reply, Docket Entry No. 36, p. 9 n.2.

[70]<u>Id.</u>

[71]DOI's Reply, Docket Entry No. 38, p. 14.

on themselves based on their fears of hypothetical future harm that is not certainly impending." 133 S. Ct. at 1151. But <u>Clapper</u> is crucially distinct from this case.

The theory of standing that plaintiffs asserted in <u>Clapper</u> relied on a "highly attenuated chain of possibilities." 133 S. Ct. at 1148. Attorneys and human rights organizations sought declaratory and injunctive relief from a provision of the Foreign Intelligence Surveillance Act that authorized surveillance of non-"United States persons" who were reasonably believed to be located outside the United States. <u>Id.</u> at 1142. The plaintiffs argued that "some of the people with whom they exchange foreign intelligence information are likely targets of surveillance under [the statute]," and that the statute harmed them by forcing them "to travel abroad in order to have in-person conversations" and to undertake "'costly and burdensome measures' to protect the confidentiality of sensitive communications." <u>Id.</u> at 1145-46. The Court summarized plaintiffs' "speculative chain of possibilities" as follows:

> (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under [the statute] rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy [the statute's] many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in inter-cepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts.

Id. at 1148.   The Court held that "respondents' self-inflicted injuries [were] not fairly traceable to the Government's purported activities under [the statute], and their subjective fear of surveillance [did] not give rise to standing."   Id. at 1152-53.

The facts here are far simpler.   Plaintiff needed only to conclude (1) that the subject ROWs and their pipelines were no longer useful and (2) that the government would enforce its own regulations.   This case more closely resembles Meese v. Keene, 107 S. Ct. 1862 (1987), in which a state legislator challenged the constitutionality of the Government's decision to label three films as "political propaganda."   Id.   The Court held that the plaintiff had standing because he showed that he "could not exhibit the films without incurring a risk of injury to his reputation and of an impairment of his political career."   Id. at 1868.   The Court in Clapper contrasted the facts before it with the facts of Keene, because "Keene involved more than a 'subjective chill' based on speculation about potential governmental action; the plaintiff in that case was unquestionably regulated by the relevant statute, and the films that he wished to exhibit had already been labeled as 'political propaganda.'"   Clapper, 133 S. Ct. at 1153.

Like the state legislator in Keene, Plaintiff is unquestionably regulated by the challenged government action (the Order), and that action has already subjected Plaintiff to more than a subjective fear of real injury.   As discussed above, 30 C.F.R. § 250.1010(h) requires the holder of an expired ROW to

-30-

decommission that ROW.  And as discussed above, there is ample evidence in the record to suggest that Plaintiff faced a "substantial risk" of being forced to bear those decommissioning liabilities.  Thus, the cost of decommissioning seven pipelines was not an injury that Plaintiff self-inflicted "based on [its] fears of hypothetical future harm," but rather a reasonable response to a plausible threat of enforcement.  See Clapper, 133 S. Ct. at 1151.  And "when 'the plaintiff is himself an object of the action (or forgone action) at issue . . ., there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."  Feld v. Zale Corp., 62 F.3d 746, 751 n.13 (5th Cir. 1995) (citing Lujan, 112 S. Ct. at 2136).

The court concludes that Plaintiff's substantive pecuniary injuries were not self-inflicted.  They were directly caused by the challenged Order that is the subject of this action, and are sufficient to confer Article III standing.

## C.  Plaintiff's Procedural Injury

Plaintiff alleges that it suffered a "procedural injury caused by its exclusion from the Assistant Secretary's decision-making."[72] "[P]rocedural rights are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."  Lujan, 112 S. Ct. at 2142 n.7

---

[72]Plaintiff's Reply, Docket Entry No. 36, p. 11.

(1992). "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." Massachusetts v. Environmental Protection Agency, 127 S. Ct. 1438, 1453 (2007). A procedural injury can suffice for standing even where the plaintiff does not prove that adherence to the proper procedure would have produced a different outcome because "'the likelihood and extent of impact are properly addressed in connection with the merits' in a harmless error analysis." United States v. Johnson, 632 F.3d 912, 921 (5th Cir. 2011) (quoting Save Our Heritage, Inc. v. Federal Aviation Administration, 269 F.3d 49, 56 (1st Cir. 2001)). "A reasonable claim of minimal impact is enough for standing even though it may not trigger agency obligations." Id. at n.45.

1.   Procedural Injury-in-Fact

Plaintiff asserts that it had a statutory right to be included in the ASLM's decision pursuant to 5 U.S.C. § 555(b), but that the ASLM excluded it from the decision-making process.[73] DOI argues that this is not enough to render Plaintiff's alleged procedural injury an injury-in-fact because "Fifth Circuit law leaves no doubt that litigants claiming procedural injuries must still establish substantive injury caused by the defendant to create Article III standing."[74]

---

[73]Id.

[74]DOI's Reply, Docket Entry No. 38, p. 9.

An individual can enforce a procedural right "'so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing.'" Center for Biological Diversity v. United States Environmental Protection Agency, 937 F.3d 533, 543 (5th Cir. 2019) (quoting Lujan, 112 S. Ct. at 2143). "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation — a procedural right in vacuo — is insufficient to create Article III standing." Summers v. Earth Island Institute, 129 S. Ct. 1142, 1151 (2009). "This does not mean, however, that the risk of real harm cannot satisfy the requirement of concreteness." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1549 (2016). "[T]he violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. . . . a plaintiff in such a case need not allege any additional harm beyond the one Congress has identified." Id.; see also Sayles v. Advanced Recovery Systems, Inc., 865 F.3d 246, 250 (5th Cir. 2017) (consumer debt-collection agency's violation of Fair Debt Collection Practices Act exposed consumer to "real risk of financial harm" caused by inaccurate credit rating). The court therefore rejects DOI's argument that a plaintiff must allege a substantive injury that stands completely independent of the alleged procedural injury. If a plaintiff also had to prove a freestanding substantive injury, there would be no reason to allow

procedural-injury standing.  Plaintiff can establish injury-in-fact by showing that it was deprived of a procedure designed to protect it from the risk of real harm.

Under 5 U.S.C. § 555(b), "an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding."  Accordingly, an administrative agency's denial of an interested person's right to be heard creates an Article III injury.  See, e.g., Salem v. Pompeo, 432 F. Supp. 3d 222, 232 (E.D. N.Y. 2020) (plaintiffs suffered an injury in that they were U.S. citizens who were denied the fair opportunity as required by the APA to apply for passports and proof of citizenship).

Although the Fifth Circuit has not articulated a formal test for qualifying an "interested person" under § 555(b), it has found that "a requirement of privity" is "much too narrow." Pennzoil Co. v. Federal Energy Regulatory Commission, 645 F.2d 360, 391 (5th Cir. 1981).  In Pennzoil pipeline customers could challenge an "area rate clause" in a contract to which they were not a party, "because it [was] they who must ultimately bear the cost of any higher prices."  Id.  Other cases support the conclusion that a party is "interested" in any agency proceeding when that proceeding has the potential to deprive it of some material benefit.  See, e.g., SourceAmerica v. United States Department of Education, 368 F. Supp. 3d 974, 999 (E.D. Va. 2019) ("The arbitration proceeding thus had the potential to — and, ultimately, did — deprive

-34-

[plaintiff] of a contract that it expected to receive.  As such, plaintiffs were 'interested person[s]' with respect to the [agency] arbitration, and § 555(b) granted them a right to appear before the panel.'") rev'd on other grounds, 826 F. App'x 272 (4th Cir. 2020); Nichols v. Board of Trustees of Asbestos Workers Local 24 Pension Plan, 835 F.2d 881, 896 (D.C. Cir. 1987) ("Beneficiaries in a plan qualifying under ERISA unquestionably possess an 'interest' in agency deliberations that might reduce their retirement benefits.").

On November 28, 2018, Tennessee Gas's parent company sent a "Request for Immediate Action" to the Senior Advisor to the Region Director of BSEE seeking once again to transfer the subject ROWs to Plaintiff.[75]  Nothing in the record indicates that Tennessee Gas, its parent company, or DOI ever informed Plaintiff that the issue of the ROW assignments was being re-adjudicated.  While five other recipients were copied on the November 28, 2018, letter — including the ASLM, the Director of the BSEE, and the Region Director of BSEE's Gulf of Mexico Region — Plaintiff was not copied on the letter.[76]  The ASLM issued the challenged order at the ex parte urging of Tennessee Gas's parent company and without any input from Plaintiff, transferring the subject ROWs to Plaintiff along with millions of dollars in attendant liabilities.  Even if these

---

[75]Revived Request, Docket Entry No. 28-1, AR0006.

[76]Id. at AR0008.

-35-

liabilities were not sufficiently concrete or imminent to qualify as injuries unto themselves — they constituted a "risk of real harm" sufficient to "satisfy the requirement of concreteness" for the purpose of establishing a procedural injury.  See Spokeo, 136 S. Ct. at 1549.

Plaintiff's right to be heard under 5 U.S.C. § 555(b) exists to vindicate its rights as an "interested person."  Plaintiff is an interested person because "it is [Plaintiff] who must ultimately bear the cost" of maintaining and decommissioning the subject ROWs that were assigned by the ASLM's Order.  See Pennzoil, 645 F.2d at 391.  The ex parte lobbying of the ASLM by Tennessee Gas and its parent company had the potential to - and ultimately did - result in the imposition of millions of dollars in liability on Plaintiff, and as such 5 U.S.C. § 555(b) granted Plaintiff a right to appear before the ASLM.  See SourceAmerica, 368 F. Supp. 3d at 999.  These liabilities, even if they were not certainly impending, nonetheless constituted a "real risk of financial harm" that Plaintiff had a concrete interest in avoiding.  See Sayles, 865 F.3d at 250.  It follows that the "procedures in question [were] designed to protect some threatened concrete interest that is the ultimate basis of [Plaintiff's] standing."  See CBD, 937 F.3d at 543.

Plaintiff has shown that it was deprived of a procedure designed to protect it from the risk of real harm.  Accordingly, the court holds that Plaintiff's pleaded procedural injury is sufficiently concrete to constitute an injury-in-fact.

2.   <u>Traceability of Plaintiff's Procedural Injury</u>

DOI argues that Plaintiff's alleged procedural injury "fails to solve its causation problem."[77]   When a party challenges an administrative agency's failure to satisfy a procedural requirement, "the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury." <u>CBD,</u> 937 F.3d at 542-43.   "A procedural-rights plaintiff . . . must establish that the injury is fairly traceable to the [challenged] government action or inaction." <u>Id.</u> at 543 (internal quotation and citation omitted).

DOI argues that Plaintiff caused its own procedural injury because Plaintiff "chose not to intervene" in the IBLA proceedings that led to reversal of the Expiration Notices.[78]   But the IBLA proceedings did not subject Plaintiff to the "real risk of harm" that is the "ultimate basis of its standing."   The IBLA proceedings followed from Tennessee Gas's appeal of the Expiration Notices and the Final Order, not from an appeal of the Assignment Rejection Orders.[79]   It is true that Tennessee Gas, in appealing the Expiration Notices and Final Order, also mentioned the Assignment

---

[77]DOI's Reply, Docket Entry No. 38, p. 8.

[78]<u>Id.</u>

[79]<u>See</u> IBLA Affirmation, Docket Entry No. 28-1, AR0280 ("TGP appeals from a series of expiration notices . . . and from [the Final Order].").

Rejection Orders.[80]   But by the time of the IBLA proceedings, the
window for appealing the Assignment Rejection Orders had closed.
As the ASLM's Senior Counselor wrote in his June 2019 memorandum:
"Neither TGP nor Kinetica appealed BSEE's original decision
disapproving assignment of the ROWs to Kinetica; thus they were not
vacated by the IBLA."[81]   DOI concedes that "TGP never appealed the
assignment denials[.]"[82]   It follows that Plaintiff lacked notice
that the Assignment Rejection Orders would be reconsidered.

Tennessee Gas argues that Plaintiff had notice that the
Assignment Rejection Orders might be reversed because Plaintiff
"was in regular communication with BSEE's New Orleans pipeline
district office during the IBLA proceedings[.]"[83]   Plaintiff's
original Complaint reflects that Plaintiff knew that the issue of
the Expiration Notices and the Final Order had been remanded to
BSEE for further consideration.[84]   Both Tennessee Gas and DOI argue

---

[80]See Statement of Reasons, Docket Entry No. 29-2, AR0438,
p. 66 ("Thus, the Assignment Rejections, Expiration Notices, and
Final Order should be reversed.").

[81]Senior Counselor's Memo, Docket Entry No. 28-1, AR0003, p. 3.

[82]DOI's Reply, Docket Entry No. 38, p. 7.

[83]Memorandum of Law in Support of Intervenor-Defendant TGP Co.,
L.L.C.'s Cross-Motion for Summary Judgment and Opposition to
Plaintiff's Motion for Summary Judgment ("Tennessee Gas's Memorandum
of Law"), Docket Entry No. 33-1, p. 24 (quoting Complaint, Docket
Entry No. 1, p. 19 ¶ 60.).

[84]See Complaint, Docket Entry No. 1, p. 21 ¶ 64 ("Kinetica had
been under the impression that the case had been remanded to BSEE
for further consideration and development of the administrative
record.").

that Plaintiff should have been aware that BSEE's reconsideration of the expiration issue could also lead to reconsideration of the assignment issue.[85]

But no party contends, and the record does not suggest, that Plaintiff had actual notice that the Assignment Rejection Orders would be reconsidered.   Instead, Plaintiff alleges that "BSEE officials in the New Orleans office repeatedly told Kinetica's Kurt Cheramie that the rights of way had expired and that there was no basis under the agency's long-standing policy for the agency to change its mind about that decision given the lengthy periods of time since the pipelines had last been used to transport gas."[86] Plaintiff's contact with BSEE, far from giving it reason to expect reversal of the Assignment Rejection Orders, led it to be reassured that such a reversal would not occur.

Moreover, Plaintiff never had notice that the ASLM was assuming jurisdiction over the ROW assignment issue.   The Administrative Record does not reveal how or when Kinder Morgan's request to the BSEE's Gulf of Mexico Region Director was elevated

---

[85] See Tennessee Gas Pipeline's Reply in Support of Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, Docket Entry No. 37, p. 14 ("Any party would or should have understood that by challenging the expiration determinations, the assignment rejections were also subject to reversal."); DOI's Reply, Docket Entry No. 38, p. 7 ("Kinetica was indisputably on notice that the bases for the assignment denials — right-of-way (ROW) expirations — were being appealed to the IBLA.").

[86] Complaint, Docket Entry No. 1, p. 19 ¶ 60.

to the ASLM's office, only that the ASLM was copied on the request and Plaintiff was not.[87]   Kinder Morgan's request had the effect of taking the ROW-assignment issue outside any process of which Plaintiff had notice.   The fact that Kinder Morgan took this extraordinary action underscores its significance and the concomitant necessity to inform the party likely to be affected by the decision.   But Plaintiff was not informed.   Instead, Kinder Morgan lobbied the ASLM ex parte.

Plaintiff could not assert its right to be heard in a discussion of which it was never given notice.   The court rejects DOI's argument that Plaintiff "showed up to complain that it was excluded from a process that it had voluntarily abandoned."[88] Plaintiff did not "voluntarily abandon" the process that subjected it to injury — it was shut out of that process altogether.

DOI next argues that even if Plaintiff did suffer a procedural injury, that "does not alleviate [Plaintiff's] obligation to establish that DOI caused its substantive injury."[89]   DOI relies on Fifth Circuit precedent holding that procedural-injury plaintiffs must establish a causal chain with at least two links: "one connecting the omitted [procedure] to some substantive government decision that may have been wrongly decided because of the lack of

_____

[87]Revived Request, Docket Entry No. 28-1, AR0006, p. 6.

[88]DOI's Reply, Docket Entry No. 38, p. 5.

[89]Id. at 10.

[procedure] and one connecting that substantive decision to the plaintiff's particularized injury." CBD, 937 F.3d at 543. Analogizing Plaintiff to the petitioners in CBD, DOI argues that Plaintiff's procedural injury "helped [it] establish the first causal link, [but is] no help establishing the second causal link."[90]

For the reasons explained in Part III.B, above, the court concludes that DOI caused Plaintiff's substantive injury. Plaintiff had a right to be heard by the ASLM before the ASLM issued the Order. But for the Order, Plaintiff would have no liability for the subject ROWs. Thus, Plaintiff's CBD burden is satisfied: Plaintiff has connected the challenged substantive government decision (the Order) to the lack of proper procedure (Plaintiff's right to be heard under 5 U.S.C. § 555(b)), and it has connected that substantive decision to its particularized injury (administrative and decommissioning liabilities). There is thus little question that the Order and the ASLM's decision to forego a hearing or otherwise provide Plaintiff an opportunity to participate caused Plaintiff an injury, and that a judgment vacating the Order will redress it.

Plaintiff's interest in not being subject to millions of dollars in decommissioning and administrative costs constituted a "concrete interest," and this interest "[was] affected by the deprivation" of Plaintiff's right to be heard by the ASLM. See

---

[90] Id.

Summers, 129 S. Ct. at 1151.  Accordingly, the court concludes that Plaintiff has pled an actual, redressable procedural injury that was caused by DOI.

For the reasons explained above, the court concludes that Plaintiff has pled substantive and procedural injury sufficient to confer Article III standing.[91]

## V.  Due Process

Plaintiff alleges that "by depriving [it] of the right to participate in the proceeding — and to raise issues and provide pertinent documents relevant to his analysis — the Assistant Secretary caused Interior to violate [its] right to due process by adjudicating its property interests without providing [it] an opportunity to be heard."[92]  DOI argues that Plaintiff's due process rights were not violated because (1) Plaintiff was not deprived of a protected property interest and (2) Plaintiff "made a decision to forego participation in the IBLA proceedings."[93]

The Due Process Clause provides that no person "shall be

---

[91]DOI has raised a one-sentence standing argument in its last filing (DOI's Reply, Docket Entry No. 38, pp. 15-16) raising the specter of an intrabranch dispute.  The court will not devote judicial resources to an argument that DOI does not find worthy of briefing.  Moreover, DOI presents no reason why it could not solicit the views of FERC or any other agency before revisiting the Order.

[92]Plaintiff's Reply, Docket Entry No. 36, p. 8.

[93]DOI's Reply, Docket Entry No. 38, p. 21.

deprived of life, liberty, or property without due process of the law." U.S. Const. amend. V.  Procedural due process cases require a "familiar two-part inquiry:  [the court] must determine whether [the plaintiff] was deprived of a protected interest, and, if so, what process was his due."  Logan v. Zimmerman Brush Co., 102 S. Ct. 1148, 1153-54 (1982).

A.    **Protected Property Interest**

Plaintiff argues that the Order deprives it of property by making it liable for administrative and decommissioning costs.[94] DOI argues that because BSEE had discretion to grant or deny the ROW assignment requests, "there is no constitutionally protected property interest in the ROW assignment application."[95]

"Procedural due process is not itself an independent right, but merely a condition precedent to the deprivation of a life, liberty, or property interest."  Haitian Refugee Center v. Smith, 676 F.2d 1023, 1037 (5th Cir. 1982) (internal citation omitted). The "threshold requirement of any due process claim is the government's deprivation of a plaintiff's liberty or property

---

[94]See Plaintiff's Reply, Docket Entry No. 36, p. 26 ("At a minimum, basic notions of due process entitled [Plaintiff] to notice and an opportunity to comment . . . before Interior could saddle [Plaintiff] with ROW grants it does not want and are likely useless, and their attendant liabilities (including maintenance and administrative obligations, such as payments to the Department of the Interior, and substantial decommissioning costs).").

[95]Tennessee Gas's Memorandum of Law, Attachment 1 to Tennessee Gas's MSJ, Docket Entry No. 33-1, p. 27.

interest." <u>DePree v. Saunders,</u> 588 F.3d 289 (5th Cir. 2009) <u>abrogated on other grounds by Sims v. City of Madisonville,</u> 894 F.3d 632 (5th Cir. 2018).

"Property interests 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" <u>Wells Fargo Armored Service Corp. v. Georgia Public Service Commission,</u> 547 F.2d 938, 940 (5th Cir. 1977) (quoting <u>Board of Regents of State Colleges v. Roth,</u> 92 S. Ct. 2701, 2706 (1972)). "To generate a due process claim, [a plaintiff] must first demonstrate that it holds an interest arising out of some understanding with [another] that transcends 'an abstract need or desire' or a 'unilateral expectation' and qualifies as a 'legitimate claim of entitlement.'" <u>Id.</u>

"[B]usiness in the sense of . . . the <u>activity of making a profit</u> is not property in the ordinary sense." <u>College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,</u> 119 S. Ct. 2219, 2225 (1999) (emphasis in original). And "'a benefit is not a protected entitlement if government officials may grant or deny it in their discretion.'" <u>Ridgely v. Federal Emergency Management Agency,</u> 512 F.3d 727, 735 (5th Cir. 2008) (quoting <u>Town of Castle Rock v. Gonzales,</u> 125 S. Ct. 2796, 2803 (2005)).

The liabilities imposed on Plaintiff by the ASLM's Order have

already been discussed. The question is not whether Plaintiff has a property interest in its own money, time, and labor, as it certainly does. The question is whether Plaintiff had a "legitimate claim of entitlement" in avoiding the liabilities that constitute its substantive injuries. See Roth, 92 S. Ct. at 2706.

In the spring of 2014 BSEE rejected the assignments of the subject ROWs from Tennessee Gas to Plaintiff. The administrative appeal period for those decisions was 30 days. See 43 C.F.R. § 4.411(a)(2)(ii) ("If a decision is published in the Federal Register, a person not served with the decision must transmit the notice of appeal in time for it to be received in the appropriate office no later than 30 days after the date of publication."). The decisions were not appealed.[96] DOI acknowledges that the rejections were "final," in the sense that the time to administratively appeal the rejections had expired.[97]

But DOI argues that even five years after the assignment requests were rejected and the chance to appeal them had expired, the requests remained subject to BSEE's approval at any time.[98] Because Plaintiff "agreed to take on all the 'attendant

---

[96]Order, Docket Entry No. 28-1, AR0002, p. 2; Senior Counse or's Memo, Docket Entry No. 28-1, AR0003, p. 3.

[97]DOI's Reply, Docket Entry No. 38, p. 12.

[98]See Tennessee Gas's Memorandum of Law, Attachment 1 to Tennessee Gas's MSJ, Docket Entry No. 33-1, p. 27 ("BSEE has statutory and regulatory discretion to grant or deny an assignment request. Thus, there is no constitutionally protected property interest in the ROW assignment application.").

liabilities' when it executed the assignment agreements with TGP in 2014," DOI says, "[t]he core of [Plaintiff's] argument is that its business transaction with TGP would have been more lucrative but for the ASLM's decision.   Even if that decision lowered [Plaintiff's] profit margin, it did not deprive [Plaintiff] of a protected property interest."[99]

DOI cites <u>Dennis Melancon, Inc. v. City of New Orleans</u>, 703 F.3d 262, 272 (5th Cir. 2012), for the proposition that "a protected property interest simply cannot arise in an area voluntarily entered into . . . which, from the start, is subject to pervasive Government control."[100]  The Fifth Circuit was quoting an opinion from a sister circuit, <u>Mitchell Arms, Inc. v. United States</u>, 7 F.3d 212, 216 (Fed. Cir. 1993).  The Fifth Circuit followed the quote cited by DOI by stating:  "We need not go that far, however, to conclude that Plaintiffs have not demonstrated a substantial likelihood of establishing that [the statutes at issue] effected a regulatory taking."  <u>Melancon,</u> 703 F.3d at 272.  The Fifth Circuit did not hold that property interests cannot arise in heavily regulated markets.

Moreover, the court is not persuaded that the ASLM's discretion over the ROW assignments was as unfettered as DOI argues.  DOI characterizes the Order as a continuation of the

---

[99]DOI's Reply, Docket Entry No. 38, p. 22.

[100]DOI's Reply, Docket Entry No. 38, p. 22.

"natural consequences of [Plaintiff's] voluntary actions . . ."[101] but the Order, issued on June 27, 2019, was the unilateral revival of final agency actions that had been concluded in the spring of 2014.  There was no extant application for the ASLM to approve, and no pending request or appeal for the ASLM to take jurisdiction over.   Plaintiff reasonably believed that the transaction had ended, and Tennessee Gas's parent company evidently shared this view:  The November 28, 2018, letter from Kinder Morgan is captioned "Re: Request for Immediate Action - Revived Requests for Transfer of Rights of Way."[102]  To "Revive" is to "restore to life or consciousness."  Random House Webster's College Dictionary (1999 ed.).   Kinder Morgan's November 28, 2018, letter evidences its understanding that the assignment requests at issue had been dead for five years.[103]

The Order did not just make some preexisting "business transaction" less "lucrative" for Plaintiff — it resuscitated a request that had long since expired.  Plaintiff has a legitimate

---

[101]Id. at 12.

[102]Revived Requests, Docket Entry No. 28-1, AR0006, p. 6.

[103]For the same reason, the court is not persuaded by DOI's argument that the court should decline to exercise jurisdiction over this case because "the agency did precisely what [Plaintiff] asked it to do: approved its assignment requests."  DOI's Brief, Docket Entry No. 34-1, p. 21.  DOI argues that the established rule whereby a prevailing party cannot appeal a favorable judgment militates against the court's involvement in this case.  Id.  But there were no pending requests from Plaintiff for the ASLM to review.  There was only a unilateral, ex parte request from a party adverse to Plaintiff.

claim of entitlement to the money, time, and labor that it has been forced to expend — and that it risks being forced to expend — as a result of the ASLM's Order, because Plaintiff was entitled to rely on the finality of the Assignment Rejection Orders.  This is true notwithstanding DOI's argument[104] that "an administrative agency has the inherent authority to reconsider its decisions."  See Macktal v. Chao, 286 F.3d 822, 825-26 (5th Cir. 2002).  That authority "is not unlimited" — it must occur "within a reasonable time after the first decision, and notice of the agency's intent to reconsider must be given to the parties."  Id. at 826 (citing Dun & Bradstreet Corp. Foundation v. United States Postal Service, 946 F.2d 189, 193 (2d Cir. 1991); Bookman v. United States, 197 Ct. Cl. 108, 453 F.2d 1263, 1265 (1972)).  Plaintiff had a right to rely on the finality of a years-old decision that had not been appealed within the permitted time frame, and such a decision could only be properly reversed if Plaintiff was first given notice.

DOI argues that the court should be guided by the analysis in Wells Fargo, 547 F.2d at 939-40,[105] in which an armored car service and holder of an "irregular route" motor carrier certificate brought suit under 42 U.S.C. § 1983 to enjoin the operations of a competitor under a subsequently granted certificate for the same

---

[104]DOI's Reply, Docket Entry No. 38, p. 7.

[105]DOI's Reply, Docket Entry No. 38, p. 22.

eight-county area. The Fifth Circuit held that the armored car service was not entitled to the protection of due process because it had not been deprived of any property interest. Id. at 941. The armored car service's "hope of being free from competition" did not qualify as a "legitimate claim of entitlement," especially considering that state law expressly rejected the notion that the certificate entitled its holder to anything more than the conduct of its own operations between designated points. Id. at 940-41.

DOI argues that "[t]hough the initial denials may have provided [Plaintiff] with some 'hope of being free from' those obligations, it never developed 'a legitimate claim of entitlement' of avoiding those obligations."[106] Id. at 940. But the facts of this case easily distinguish it from Wells Fargo. The armored car service in Wells Fargo unreasonably expected that a certificate from the state would free it from competition. Wells Fargo, 547 F.2d at 940-41. Plaintiff, on the other hand, reasonably expected to be free from liability for the subject ROWs because the assignment of the ROWs had been rejected and the window to appeal the rejection had been closed for five years. The court concludes that the Order did deprive Plaintiff of a protected property interest.

B.   What Process Was Due

---

[106] Id.

Plaintiff argues that principles of due process required the ASLM to provide Plaintiff with notice and opportunity to be heard before assigning the subject ROWs to Plaintiff.[107]

"A government decision depriving an individual of his right to 'life, liberty, or property' must, at a minimum, be preceded by notice and an opportunity for the individual to be heard." Morris v. Livingston, 739 F.3d 740, 750 (5th Cir. 2014) (quoting Mullane v. Central Hanover Bank & Trust Co., 70 S. Ct. 652, 656 (1950)). "Administrative deprivations of property are governed by the 'familiar procedural due process inspection instructed by Mathews v. Eldridge, 96 S. Ct. 983 (1976).'" Sahara Health Care, Inc. v. Azar, 975 F.3d 523, 529 (5th Cir. 2020). Under this test the court balances the private interest, the governmental interest, and the costs and benefits of additional procedures. Specifically, it looks to:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would

---

[107]See Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, Docket Entry No. 31, p. 18 ("With a signature, Interior transferred millions of dollars of pipeline decommissioning liabilities and obligations from Tennessee Gas to [Plaintiff], and yet Interior never reached out to [Plaintiff] to obtain its viewpoint on the matter despite the Administrative Record making it crystal clear that [Plaintiff] had a property interest and financial stake in the outcome.").

entail.

Mathews, 96 S. Ct. at 903.  See also Henry J. Friendly, Some Kind of Hearing, 123 U. Pa. L. Rev. 1267, 1296-97 (1975) (suggesting that more severe governmental actions require greater procedural safeguards).

5 U.S.C. § 555(b) provides that a party is entitled to be heard in an ongoing agency proceeding, absent exigent circumstances.  See also Advanced Systems Technology, Inc. v. U.S., 69 Fed. Cl. 474, 484 (2006) ("Further, section 555(b) is 'universally understood to establish the right of an interested person to participate in an on-going agency proceeding.'") (quoting Block v. SEC, 50 F.3d 1078, 1085 (D.C. Cir. 1995)).  "[A] party's entitlement to the protections afforded by Section 555 corresponds to procedural due process."  Miles Construction, LLC v. United States, 108 Fed. Cl. 792, 805 (Fed. Cl. 2013) (citing Pension Benefit Guaranty Corp. v. LTV Corp., 110 S. Ct. 2668, 2681 (1990)).  "In that respect, [t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  Id. (quoting Mathews, 96 S. Ct. at 902) (internal quotations omitted).

Administrative agencies "must accredit themselves by acting in accordance with the cherished judicial tradition embodying the basic concepts of fair play."  Morgan v. United States, 58 S. Ct. 773, 778 (1938).  Accordingly, due process instructs administrative agencies to provide both sides of a dispute — not just one — with

-51-

notice and an opportunity to be heard. See id. (calling it a
"vital defect" when the Secretary of Agriculture issued an order
fixing maximum rates to be charged by certain market agencies
"after an ex parte discussion with [prosecutors] and without
according any reasonable opportunity to the respondents in the
proceeding to know the claims thus presented and to contest them").
See also Miles Construction, 108 Fed. Cl. at 805 (Fed. Cl. 2013)
(holding that agency's failure to notify interested party regarding
agency's "self-initiated" expansion of a protest examination was
arbitrary and capricious); accord, Joint Anti-Fascist Refugee
Committee v. McGrath, 71 S. Ct. 624, 647-48 (1951)
(Frankfurter, J., concurring) ("[W]hen Congress has given an
administrative agency discretion to determine its own procedure,
the agency has rarely chosen to dispose of the rights of
individuals without a hearing, however informal. . . . [F]airness
can rarely be obtained by secret, one-sided determination of facts
decisive of rights.").

Plaintiff's right to be heard by the ASLM is established by
statute in 5 U.S.C. § 555(b). The extent of the procedural
safeguard that was due Plaintiff can be determined by reference to
Mathews, which requires that the court first consider Plaintiff's
interest in avoiding the administrative and decommissioning costs;
second, the risk of erroneously imposing those costs through the
procedures used, and the probable value of additional procedural
safeguards (e.g., notifying Plaintiff that the ASLM was

reconsidering the ROW assignments and giving Plaintiff a chance to present a case); and finally, the Government's interests, including the function involved and the fiscal and administrative burdens that the additional procedural requirement would entail.   See Mathews, 96 S. Ct. at 903.

As for the first and third Mathews factors, Plaintiff's interest in being heard outweighs whatever slight burden the government would incur by holding a hearing.   Tennessee Gas itself represented to the IBLA that decommissioning the subject pipelines would require "weeks of work from dozens of individuals, necessitating the expenditure of millions of dollars."[108]   As explained, in Part III.A, above, the Order put Plaintiff at substantial risk of incurring these liabilities.   This is in addition to the administrative and decommissioning costs that Plaintiff has already paid.

As for the second Mathews factor, because Plaintiff was excluded from the ASLM's decision-making process, the administrative record necessarily does not reflect the issues Plaintiff would have raised or the documents Plaintiff would have submitted if the ASLM had solicited its views.   But the administrative record reflects that Plaintiff had disclaimed future utility for the pipelines, and that the need for decommissioning

---

[108]Tennessee Gas's Petition for Stay, Docket Entry No. 29-2, AR0739, p. 367.

had been a subject of dispute.[109]   The ASLM thus should have been aware that there was a risk that by excluding Plaintiff from the decision-making process, it would erroneously deprive Plaintiff of a protected property interest.

DOI argues that Plaintiff's due process claim "fails because it was not deprived of notice, as it made a decision to forego the IBLA proceedings."[110]   This is essentially the same argument that the court rejected with respect to the causation of Plaintiff's substantive injuries, in Part III.B, above.   The IBLA proceedings were not the proceedings in which Plaintiff was subjected to the liabilities that constitute its substantive injuries.   It was the ASLM's Order that directly shifted all the subject ROWs' attendant liabilities to Plaintiff, and the ASLM issued the Order without informing Plaintiff that it had assumed jurisdiction over the matter.

The court concludes that the ASLM failed to provide Plaintiff with notice and an opportunity to be heard before adjudicating Plaintiff's property rights.   The Order thus deprived Plaintiff of procedural due process.   Because the procedure that resulted in the Order was contrary to a constitutional right, the proper remedy is to vacate and set aside the Order.   5 U.S.C. § 706(2)(B).

---

[109]Plaintiff's Letter to BSEE, Docket Entry No. 29-2, AR0452-53, pp. 80-81.

[110]DOI's Reply, Docket Entry No. 38, p. 21.

This conclusion renders unnecessary any inquiry into whether the Order was arbitrary and capricious or otherwise unlawful under the APA because the due-process claim alone is sufficient to grant Plaintiff relief.   Accordingly, Count II of Plaintiff's MSJ, alleging that the Order denied Plaintiff due process under the Fifth Amendment of the United States Constitution, will be granted. Count I of Plaintiff's MSJ, alleging that the Order violated the APA, will be denied as moot.

## VI.   Conclusion and Order

For the reasons explained above, Plaintiff's Motion for Summary Judgment (Docket Entry No. 30) is **GRANTED** as to Count II, and is **DENIED** as to Count I.

Intervenor-Defendant Tennessee Gas Pipeline Company, L.L.C.'s Cross-Motion for Summary Judgment (Docket Entry No. 33) is **DENIED**. Defendant U.S. Department of the Interior's Cross-Motion for Summary Judgment (Docket Entry No. 34) is **DENIED**.

**SIGNED** at Houston, Texas, on this 3rd day of December, 2020.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE